IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JAVONTAI THAMES,
      Petitioner,

vs.                           Case No.:  3:18cv1547/MCR/EMT

MARK S. INCH,
      Respondent.
_____/

## <u>REPORT AND RECOMMENDATION</u>

This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (ECF No. 1).  Respondent filed an answer and relevant portions of the state court record (ECF No. 14).  Petitioner filed a reply (ECF No. 18).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.  *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues presented by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is

further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 14).[1]  Petitioner was charged in the Circuit Court in and for Escambia County, Florida, Case No. 2013-CF-3907, with one count of second degree felony murder (Ex. A at 3).  Following a jury trial on June 9–11, 2014, Petitioner was found guilty as charged (Ex. A at 52, Ex. B).  The jury made a specific finding that Petitioner actually possessed a firearm during the commission of the crime (Ex. A at 52).  On September 2, 2014, the court sentenced Petitioner to thirty-five (35) years in prison with a 10-year mandatory minimum and pre-sentence jail credit of 385 days (Ex. A at 287–94).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D14-4312 (Ex. D).  The First DCA affirmed the judgment per curiam without written opinion on March 31, 2016 (Ex.

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (ECF No. 14).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

Case No.: 3:18cv1547/MCR/EMT

F).  *Thames v. State*, 187 So. 3d 1239 (Fla. 1st DCA 2016) (Table).  The mandate issued April 18, 2016 (*id.*).

On June 8, 2016, Petitioner filed a motion to reduce or modify sentence in the state circuit court, pursuant to Rule 3.800(c) of the Florida Rules of Criminal Procedure (Ex. G).  The circuit court denied the motion on July 22, 2016 (*id.*).

On February 8, 2017, Petitioner filed a petition for writ of habeas corpus in the First DCA, Case No. 1D17-0541, alleging ineffective assistance of appellate counsel (Ex. H).  The First DCA denied the petition on the merits on March 3, 2017 (*id.*).  *Thames v. State*, 230 So. 3d 1176 (Fla. 1st DCA 2017) (Table).

On February 15, 2017, Petitioner filed a motion for post-conviction relief in the state circuit court, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. I at 9–24).  The state circuit court summarily denied the motion on September 1, 2017 (*id.* at 33–42).  Petitioner appealed the decision to the First DCA, Case No. 1D17-4579 (*id.* at 151).  The First DCA affirmed the circuit court's decision per curiam without written opinion on March 6, 2018 (Ex. K).  *Thames v. State*, 242 So. 3d 1046 (Fla. 1st DCA 2018) (Table).  The mandate issued April 3, 2018 (Ex. K).

On May 1, 2018, Petitioner filed a second Rule 3.850 motion in the state circuit court (Ex. L).  Petitioner filed an amended motion on May 3, 2018 (Ex. M).

In an order rendered June 11, 2018, the state circuit court denied the second Rule

3.850 motion as untimely and successive (Ex. N).

Petitioner filed the instant federal habeas action on July 17, 2018 (ECF No.

1).

## II.    STANDARD OF REVIEW

Federal courts may grant habeas corpus relief for persons in state custody

pursuant to 28 U.S.C. § 2254.  Section 2254(d) provides, in relevant part:

> **(d)**  An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the merits in
> State court proceedings unless the adjudication of the claim–
>
> > **(1)**  resulted in a decision that was contrary to, or involved
> > an unreasonable application of, clearly established Federal law,
> > as determined by the Supreme Court of the United States; or
> >
> > **(2)**    resulted in a decision that was based on an
> > unreasonable determination of the facts in light of the evidence
> > presented in the State court proceeding.

28 U.S.C. § 2254(d) (2011).

The United States Supreme Court explained the framework for § 2254 review

in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).  The

appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the
> writ if the state court arrives at a conclusion opposite to that reached by

this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Employing the *Williams* framework, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a state court proceeding, the federal court must first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" only when a Supreme Court holding at the time of the state court decision embodies the legal principle at issue. *Thaler v. Haynes*, 559 U.S. 43, 47, 130 S. Ct. 1171, 175 L. Ed. 2d 1003 (2010); *Woods v. Donald*, — U.S. —, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015) ("We have explained that clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions." (internal quotation marks and citation omitted)).

After identifying the governing legal principle(s), the federal court determines whether the state court adjudication is contrary to the clearly established Supreme Court case law. The adjudication is not contrary to Supreme Court precedent merely because it fails to cite to that precedent. Rather, the adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases. *See Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002). Where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law. *See Woods*, 135 S. Ct. at 1377 (holding, as to claim that counsel was per se ineffective in being absent from the courtroom for ten minutes during testimony concerning other defendants: "Because none of our cases confront the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks and citation omitted)). If the state court decision is contrary to clearly established federal law, the federal habeas court must independently consider the merits of the petitioner's claim. *See Panetti v. Quarterman*, 551 U.S. 930, 954, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007).

If the "contrary to" clause is not satisfied, the federal habeas court next determines whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The federal court defers to the

state court's reasoning unless the state court's application of the legal principle(s) was "objectively unreasonable" in light of the record before the state court. *Williams*, 529 U.S. at 409; *see Holland v. Jackson*, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam).  In applying this standard, the Supreme Court has emphasized:

> When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong.  Federal habeas review thus exists as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal."  *Harrington*, *supra*, at 102–103, 131 S. Ct. 770 (internal quotation marks omitted).

*Woods*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding.  *See Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011).  As with the "unreasonable

application" clause, the federal court applies an objective test. *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). Federal courts "may not characterize . . . state-court factual determinations as unreasonable merely because we would have reached a different conclusion in the first instance." *Brumfield v. Cain*, — U.S. —, 135 S. Ct. 2269, 2277, 192 L. Ed. 2d 356 (2015) (quotation marks omitted).

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct. 28 U.S.C. § 2254(e)(1). The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*; *see, e.g.*, *Miller-El*, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by the AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence").

Only if the federal habeas court finds that the petitioner satisfied § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claim. *See Panetti*, 551 U.S. at 954. Even then, the writ will not issue unless the petitioner shows that he is in custody "in violation of the

Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102.

## III.    EXHAUSTION AND PROCEDURAL DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner exhaust available state court remedies, *see* 28 U.S.C. § 2254(b)(1), thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L. Ed. 2d 865 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, that is, procedurally barred from federal review. *See Bailey v. Nagle*, 172 F.3d 1299, 1302–03 (11th Cir. 1999). In such an instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine. *Id.* at 1303.

To overcome a procedural default, the petitioner must show cause for the default and prejudice resulting therefrom, or that the federal court's failure to reach the merits of the claim would result in a fundamental miscarriage of justice. *Tower*

*v. Phillips*, 7 F.3d 206, 210 (11th Cir. 1993); *Parker v. Dugger*, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991).  "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." *McCleskey v. Zant*, 499 U.S. 467, 497, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986)).  To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995).  "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." *Id.*  Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare.  To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.

*Id.*

Within this framework, the court will review Petitioner's claims.

## IV.    PETITIONER'S CLAIMS[2]

### A.    Ground Four:  "Petitioner received ineffective assistance of counsel due to counsel conceding Petitioner's guilt without his consent."

Petitioner alleges his trial counsel conceded that Petitioner committed an attempted robbery, which was the underlying felony for the second degree felony murder charge (ECF No. 1 at 15).  Petitioner alleges he did not agree with this strategy and wished to pursue a defense theory that the incident was a "drug deal gone bad" (*id.*).  Petitioner contends counsel's conceding his guilt of attempted robbery without his consent was per se ineffective, and he does not need to demonstrate prejudice (*id.*).  Petitioner concedes he did not present this ineffective-assistance-of-trial-counsel ("IATC") claim in his Rule 3.850 motion (*id.*).  He contends he is entitled to federal review of his IATC claim under *Martinez v. Ryan*, 566 U.S. 1, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012) (*id.*).

Respondent contends Petitioner is not entitled to federal review under *Martinez* for two reasons.  First, Petitioner cannot establish that his lack of post-

---

[2] Petitioner's habeas petition presented nineteen (19) claims (ECF No. 1 at 9–64).  After Respondent filed an answer contending Petitioner was not entitled to federal habeas relief on any of his claims (ECF No. 14), Petitioner filed a reply conceding that Respondent's argument was correct as to Issues I, II, III, VII, VIII, IX, XI, XII, XIV, XV, XVI, XVII, XVIII, and XIX (ECF No. 18 at 4, 16–17, 20–23).  In light of Petitioner's concession, the court will address only Issues IV, V, VI, X and XIII.

conviction counsel caused his procedural default (ECF No. 14 at 33–36). Respondent asserts Petitioner was well aware of the factual basis for his IATC claim, as demonstrated by the fact that he presented it in his pro se § 2254 petition, and he has not shown why he simply did not raise the claim earlier in his Rule 3.850 motion (*id.*). Second, Respondent contends Petitioner's underlying IATC claim is not a "substantial" one (*id.* at 36–40).

In Petitioner's reply, he contends the mere fact that he did not have counsel in the post-conviction proceeding satisfies the "cause" requirement under *Martinez* (ECF No. 18 at 6–7). He argues *Martinez* does not require the petitioner to show that his lack of post-conviction counsel caused his procedural default (*id.*). Petitioner additionally argues his IATC claim is "substantial" (*id.* at 7–8).

In *Martinez*, the Supreme Court recognized that a habeas petitioner may establish cause for a procedural default of a claim of an IATC claim in the following circumstances:

> [W]hen a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding, a prisoner may establish cause for a default of an ineffective-assistance claim in two circumstances. The first is where the state courts did not appoint counsel in the initial-review collateral proceeding for a claim of ineffective assistance at trial. The second is where appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

566 U.S. at 14. In such instances, the habeas petitioner must also "demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Id.*

In *Hittson v. GDCP Warden*, the Eleventh Circuit then explained *Martinez*'s "substantial claim" requirement:

> *Martinez* articulated the "substantial claim" requirement as follows:
>
> > To overcome the default, a prisoner must . . . demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit. *Cf. Miller–El v. Cockrell*, 537 U.S. 322, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (describing standards for certificates of appealability to issue).
>
> *Martinez*, — U.S. at —, 132 S. Ct. at 1318–19. Neither *Martinez* nor *Trevino* [*v. Thaler*, — U.S. —, 133 S. Ct. 1911, 185 L. Ed. 2d 1044 (2013)] elaborated on or applied this standard, but we take the Court's reference to *Miller–El* to mean that it intended that lower courts apply the already-developed standard for issuing a COA, which requires "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).
>
> As the Court explained in *Miller–El*, "[a] petitioner satisfies this standard by demonstrating . . . that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." 537 U.S. at 327, 123 S. Ct. at 1034. Where a petitioner must make a "substantial showing" without the benefit of a merits determination by

an earlier court, he must demonstrate that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 1604, 146 L. Ed. 2d 542 (2000). That does not mean that a petitioner must show "that some jurists would grant the petition." *Miller–El*, 537 U.S. at 338, 123 S. Ct. at 1040. "[A] claim can be debatable even though every jurist of reason might agree, after the . . . case has received full consideration, that petitioner will not prevail." *Id.*

We observe that this standard is similar to the preliminary review conducted by district judges in § 2254 proceedings. Rule 4 of the § 2254 Rules allows the district judge to summarily dismiss a petition "[i]f it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief." The Advisory Committee Notes further instruct that, in keeping with the heightened, fact-pleading requirement in habeas cases, "the petition is expected to state facts that point to a real possibility of constitutional error." Advisory Committee Note to Rule 4 of the Rules Governing Section 2254 Cases (quotation marks omitted).

Thus, we examine the allegations in . . . the § 2254 petition to see whether "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." In making this determination, we consider the fact-pleading requirement for § 2254 petitions, and the standard from *Strickland*.

*Hittson*, 759 F.3d 1210, 1269–70 (11th Cir. 2014) (footnotes omitted).

The *Strickland* standard is two-pronged. First, trial counsel's performance must be deficient, falling below an objective standard of professional care. *Strickland*, 466 U.S. at 688. Second, that deficient performance must have prejudiced the outcome of the petitioner's trial, i.e., but for the deficient

performance, there must be a probability that the petitioner's outcome would be different. *Id.* at 695. The petitioner seeking release bears the burden of proof regarding both deficient performance and prejudice. *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

The performance inquiry will generally boil down to whether trial counsel's actions (or inactions) were the result of deficient performance or sound trial strategy. *See Strickland*, 466 U.S. at 689 ("[T]he defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S. Ct. 158, 100 L. Ed. 83 (1955))). To protect counsel's independence, the court starts with the strong presumption that trial counsel's performance was constitutionally adequate. *Strickland*, 466 U.S. at 689.

Two principles underlie this presumption. First, the Supreme Court has time and again counseled against judging trial counsel's performance with the benefit of hindsight. *Stickland*, 466 U.S. at 689; *see also Yarborough v. Gentry*, 540 U.S. 1, 8, 124 S. Ct. 1, 157 L. Ed. 2d 1 (2003) ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight."); *Bell v. Cone*, 535 U.S. 685, 698, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) (same). Second, trial advocacy is not a science, but an art; there are few "right" answers in the proper

way to handle a trial. *Strickland*, 466 U.S. at 693 ("Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.").

This presumption is an evidentiary presumption that carries through the habeas proceeding. *Chandler v. United States*, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000). Thus, a petitioner must not present evidence merely to refute the presumption. Rather, the petitioner must present evidence that outweighs the presumed evidence of competence. *Kimmelman v. Morrison*, 477 U.S. 365, 384 106 S. Ct. 2574, 91 L.Ed.2d 305 (1986) ("[T]he defendant must rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy."). Therefore, "'where the record is incomplete or unclear about [counsel]'s actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment.'" *Chandler*, 218 F.3d at 1314 n.15 (quoting *Williams v. Head*, 185 F.3d 1223, 1228 (11th Cir. 1999)).

As to the prejudice prong of the *Strickland* standard, Petitioner's burden of demonstrating prejudice is high. *See Wellington v. Moore*, 314 F.3d 1256, 1260 (11th Cir. 2002). To establish prejudice, Petitioner must show "that every fair-minded jurist would conclude 'that there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different.'" *Jones v. GDCP Warden*, 753 F.3d 1171, 1184 (11th Cir. 2014) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome," not that counsel's conduct more likely than not altered the outcome of the proceeding. *Id.* (citation omitted). And Petitioner must show that the likelihood of a different result is substantial, not just conceivable. *Williamson v. Fla. Dep't of Corr.*, 805 F.3d 1009, 1016 (11th Cir. 2015) (citing *Richter*, 562 U.S. at 112). "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. The prejudice assessment does "not depend on the idiosyncracies [sic] of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. *Id.* at 695. Further, when the claimed error of counsel occurred at the guilt stage of trial (instead of on appeal), *Strickland* prejudice is gauged against the outcome of trial, not on appeal. *See Purvis v. Crosby*, 451 F.3d 734, 739 (11th Cir. 2006) (citing *Strickland*, 466 U.S. at 694–95).

In *Florida v. Nixon*, 543 U.S. 175, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004), the Supreme Court made clear that an attorney does not have the authority, without his client's explicit consent, to enter a guilty plea on behalf of a client, but that

counsel's concession of some level of guilt at trial is not the functional equivalent of a guilty plea. 543 U.S. at 187–88. The Court explained that despite the concession of guilt by counsel in Nixon's case, Nixon retained the rights accorded a defendant in a criminal trial, including the right to have the State prove every element of the offense beyond a reasonable doubt. *Id.* at 188. The Court also explained that a concession of guilt was not presumed to be deficient performance, and under *Strickland*, the defendant still must prove "counsel's concession trial strategy was unreasonable." *Id.* at 189. Additionally, where counsel's concession of guilt "does not rank as a failure to function in any meaningful sense as the Government's adversary," *Cronic*'s presumption of prejudice does not apply, and the petitioner must demonstrate prejudice under *Strickland*. *Nixon*, 543 U.S. at 190 (internal quotation marks and citation omitted). The Court found that Nixon had not shown he received ineffective assistance of counsel when counsel acknowledged, during the guilt phase of his capital trial, that Nixon caused the victim's death, but urged the jury to focus on the penalty phase and recommend life in prison instead of death by electrocution. *Id.* at 182–83. Although *Nixon* was a capital case, the principles set forth still apply in the non-capital context.

In Petitioner's case, prior to trial, defense counsel was aware, from the police report filed the day after Petitioner's arrest, that Escambia County Deputy Matthew

Infinger had interviewed Petitioner and Robert Boyd the day after the shooting of Ledarrious Washington (*see* Ex. A at 11–21). According to the report, Robert Boyd told Deputy Infinger that Petitioner wanted him to lure Nkosi Chamberlain to Pines at Warrington (an apartment complex in Pensacola, Florida) "so he (Thames) and Washington could rob him for his money and drugs" (*id.* at 13). Boyd told Deputy Infinger that Chamberlain arrived at the Pines, and "Thames and Ledarrious Washington were both armed with 'long guns,' and approached Chamberlain's black car" (*id.*). Boyd told Deputy Infinger he "heard gun fire and saw his cousin Thames being shot and start running" (*id.*).

According to Deputy Infinger's report, Petitioner stated that Robert Boyd had set up a drug deal for Nkosi Chamberlain, and that Petitioner and Ledarrious Washington were armed so they could rob Chamberlain (Ex. A at 13).

Defense counsel knew that the Sheriff's Office had recovered a .22 caliber Remington rifle, with one live round of ammunition in it, from the scene of the shooting. And defense counsel also knew that Petitioner had been required to provide his fingerprints to Scott Glazebrook, a latent print examiner with the Sheriff's Office, for comparison with evidence collected by the officers (*see* Ex. A at 33–34). Petitioner's fingerprint matched a fingerprint on the .22 caliber Remington rifle.

Surely anticipating that the jury would hear Petitioner's admission to Deputy Infinger, as well as testimony that Petitioner's fingerprint was on the loaded rifle, Petitioner's trial counsel, Attorney Ronald Davis, made the following opening statement:

> Earlier in the day, before Fort Walton drug dealer Nkosi Chamberlain shot Mr. Thames and killed Ledarrious Washington by shooting him 13 times, Chamberlain decided to cast his net in our community to see if there were any fish out there that would buy his elicit product, Molly, that you heard the prosecutor talk about.
>
> Chamberlain was also wanting to do a little community service work and take some guns off our streets, so he was also looking to buy guns when he came to Pensacola.
>
> His net landed on Robert Boyd, his home boy, who had met [sic] in juvenile detention some time ago. When Boyd told his cousin, Mr. Thames here, that Nkosi had product for sale, Javontai said that he wanted to buy some, 2 grams.
>
> So Boyd advised Chamberlain of this, and when advised of this, Chamberlain indicated to them, well, that he had some other business to attend to first before he could roll on into the Pines and unload his dope.
>
> So Mr. Thames and Mr. Boyd were put on hold over there at the Pines, waiting for Chamberlain to finish his business.
>
> Now, while they were waiting, they smoked some weed, Mr. Thames and his cousin, Boyd. Okay. And after they finished smoking it, while they're waiting for Chamberlain to roll in with his stuff, they decided to go for a cigarette. And on the way to get cigarettes, they run into Ledarrious Washington.

Now, Ledarrious is armed with a .45 sticking in his waistband. Javontai and Boyd are not armed. Mr. Washington is out there with his two home boys, who are rolling dice out there on the corner, by the stoop. They're armed as well, but they've got their guns laying out on the steps.

When Ledarrious Washington sees Javontai and Robert coming through there, he goes up to Javontai and says, hey, man, what's up? What's going on?

Javontai tells him, hey, I'm getting ready to buy some Molly from Trey—that's Robert Boyd's street name—from Trey's home boy who's coming in.

Well, at this point, Ledarrious Washington sees a golden opportunity. He's armed, got buddies there, so he comes up with a scheme, okay, to rob Nkoski Chamberlain.

Now, Boyd and Javontai Thames are reluctant to get involved in this, but Ledarrious Washington, armed, guns laying out with his home boys, they decide to get on board.

Now, while they're setting this up, Mr. Washington says, well, I'm not going to use the .45 I've got. There's some issues with that. So he goes upstairs and switches out his .45 and brings down the two long guns that you'll see put into evidence. He furnishes the weapons for this golden opportunity that he sees.

As—as the three are waiting for Chamberlain to roll in, there's really no discussion of how this thing is going to go down. Washington is clearly the leader. Okay. The other ones are just following, Boyd and Thames.

When Nkosi Chamberlain pulls in, he's driving a black Suzuki. He's alone in the driver's seat. He backs in in [sic] one of parking spots. At that point, Mr. Thames and Ledarrious Washington go up to his car. Ladarrious [sic] Washington is on the side of the car where Nkosi was

sitting, the driver's side, with his 12 gauge shotgun. Javontai is on the other side with a .22 tubular magazine rifle.

When Chamberlain sees the two, he immediately turns and shoots from inside his car and shoots Javontai Thames, hitting him.

At that point, Javontai drops his weapon and takes off running. There's no evidence that any words were exchanged. He didn't fire any shots. He didn't do—he simply dropped his gun and ran away wounded.

Now, his cousin Boyd is in a safe spot. He's in a safe place to watch all of this and he watches all of it. He's keeping an eye on things. And as he sees his cousin Javontai running wounded, leaving this blood trail that you'll hear about, around the corner of a building, away from all of this, Nkosi Chamberlain turns and shoots Ledarrious Washington at least two times from inside his car. And as the prosecutor told you in his opening comments, Mr. Washington falls to the ground.

Now, apparently that wasn't good enough for Mr. Chamberlain to dispel the threat to end the robbery or the attempted robbery. When Washington hits the ground, and after Mr. Thames has rounded the corner and is out of sight, Chamberlain gets out of his car and executes Ledarrious Washington and shoots him at least 11 more times, but you know what, that wasn't good enough for Chamberlain either.

Because after he executes this man, he bends over and riffles [sic] through the dead man's pockets, and Boyd will tell you he saw that. Chamberlain gets back into his car, drives off in much the same manner as he drove in. He's later arrested some—some days later. I don't know exactly when.

When the police get to the scene at the Pines, they find Mr. Thames out of sight from where this shooting and killing took place, on the other side of the building, and he's laying [sic] in the bushes or on the side, wounded. Boyd's with him.

Now, keep in mind throughout this trial, okay, that the burden of proof rests solely on the prosecutor today. The Judge is going to instruct you, and you'll get a copy of the instructions, that list the various elements of the crime of felony—second-degree felony murder and you'll have an opportunity to look at those.

And your job today will be to see if the State has proven all those elements, that the execution of Ledarrious Washington by a drug dealer, Nkosi Chamberlain, was a consequence of a robbery.

You know, the—it's hard to predict everything that you're going to see here today. That's what's interesting about trials, you know, it's sort of a dynamic process. It's ongoing. There may be some surprises from the witness stand. I can't predict everything that's going to happen.

But I want to urge you to do one thing, okay, and I think that you will by just looking at your faces, is that I want you to pay particular attention, of course to all the evidence that you see and hear today. But here's something else I want you to do, okay, is I want you to pay close attention to my cross-examination questions, and the information and the responses that I elicit from the witnesses. Okay. It's very important.

See, when you hear those responses and when you hear those questions, you may be thinking to yourself, what's that got to do with anything?

You see the nice thing about this is at the close of trial, we'll have what we call closing arguments and I'll get a chance to come back and talk to you. And at that point, I'm going to tell you what I think the significance of those responses have been on cross-examination. And I'm going to point out to you then how the State will have failed to meet its burden of proof today.

They'll give you a verdict form at the end of trial. It's going to list the charge. It'll list the lesser included offense, and it'll list not

> guilty at the bottom, and at the close of the trial, after you carefully sift
> and weigh all the evidence, and as you apply it to this exacting formula
> that the State has to meet, put together, to convict my client, you will
> see that the ingredients are not there.  I'll ask you to find him not guilty
> because he's not.

(Ex. B at 125–31).

As anticipated, Deputy Infinger testified that during one of his interviews with Petitioner, "he [Petitioner] told me that Robert Boyd had set up the drug deal for Nkosi Chamberlain to come over so that they could rob him" (*see* Ex. B at 245). Deputy Infinger admitted that the interview during which Petitioner made this statement was not recorded, but Infinger nonetheless testified that Petitioner made the statement.[3]  Also, Christine Rollins, a crime scene technician with the Sheriff's Office, testified she recovered the .22 caliber Remington rifle, with one live round of ammunition in it, from the scene of the shooting (*id.* at 147–66).   And Scott Glazebrook testified he compared Petitioner's fingerprint with a fingerprint he lifted from the .22 caliber Remington rifle, and he determined that it was Petitioner's fingerprint on the side of the rifle (*id.* at 169–77).

---

[3] Deputy Infinger conducted two recorded interviews with Petitioner and one unrecorded interview (*see* Ex. A at 359–68, Ex. B at 242–46).

Robert Boyd testified that Petitioner is his cousin (Ex. B at 190). He testified he was arrested for and charged with second degree felony murder for the death of Ledarrious Washington (*id.* at 190, 206–07). Boyd described the events on the night of the shooting as follows (*id.* at 190–206). Boyd received a text message from Nkosi Chamberlain on July 30, 2013, asking if Boyd knew anyone who wanted to buy "Molly" (crystal meth) and had any guns for sale (*id.* at 192–94). Boyd was with Petitioner at the time, and he asked Petitioner the same questions that Chamberlain had asked (*id.* at 195). Petitioner responded that he wanted to buy Molly (*id.*). Boyd texted Chamberlain, "my cousin got some fire, and yeah, he wanted to buy Molly" (*id.*). Boyd and Petitioner started walking toward the front of the Pines apartment complex, and they ran into Ledarrious Washington, whom they both knew (*id.* at 196–97). Washington had a handgun tucked under his shirt (*id.* at 199). Petitioner told Washington he was going to buy some Molly from Boyd's "homeboy," and Washington responded by suggesting that they rob Chamberlain (*id.* at 197–98). Boyd testified that Petitioner responded, "Might as well" (*id.* at 198). But Boyd said "no" to the robbery, and told Washington that he (Boyd) would text Chamberlain and tell him not to come (*id.*). Boyd testified Washington took Boyd's phone (*id.*). Boyd testified Petitioner continued to be in favor of the robbery (*id.*). Washington said the handgun was registered, so he went upstairs and retrieved

two other guns, a .22 caliber rifle and a sawed off shotgun (*id.*). The prosecutor asked Boyd if Petitioner and Washington discussed the robbery plan, and Boyd responded no, that they were simply going to run up to the car and take the Molly (*id.* at 200). Boyd called Chamberlain and told him to park in front of the Pines (*id.*). Chamberlain arrived and parked, and Boyd, Washington, and Petitioner started walking in Chamberlain's direction, but Boyd stopped at a park, while Washington and Petitioner walked up to Chamberlain's car (*id.* at 201–02). Washington was carrying the sawed off shotgun in his hands, and Petitioner was carrying the .22 caliber rifle in his hands (*id.* at 202). Washington approached the driver's side, and Petitioner approached the passenger side (*id.* at 203). Both men were pointing their weapons at Chamberlain, who was in the driver's seat (*id.* at 202–03). As Washington and Petitioner neared the car pointing their guns, Boyd heard gunshots (*id.* at 203). Boyd knew that Chamberlain was shooting, and shooting first at Petitioner (*id.* at 203–04). Boyd testified Petitioner "jumped a little bit," like he had been shot, and then dropped his gun and ran (*id.* at 204). Chamberlain then turned and shot Washington, and Washington fell to the ground (*id.* at 204–05). Boyd testified Chamberlain got out of the car and fired more rapid shots at Washington (*id.*). Chamberlain then rifled through Washington's pockets and got back into his car and left (*id.* at 224–25).

Boyd testified he started walking toward Washington, but then heard Petitioner call out to him (Ex. B at 205). Boyd testified he found Petitioner lying on the ground "shot bad" in the lower part of his body (*id.* at 206). Boyd testified he called 911 (*id.*). Boyd testified that while Petitioner was lying there, he told Boyd to "keep my mouth closed" about the robbery (*id.* at 209–10).

Boyd testified he entered a plea to second degree felony murder (Ex. B at 206–07). The prosecutor asked why he entered the plea:

Q. Why did you enter a plea?

A. Because it wasn't no point [sic] in taking it to trial.

Q. Okay. You did it. You were involved, along with Mr. Thames and Mr. Washington, in setting up a robbery, correct?

A. Yes, sir.

(Ex. B at 207).

During Attorney Davis' closing argument, he argued that the only persons who were responsible for Ledarrious Washington's death were Robert Boyd, Nkosi Chamberlain, and Washington himself (Ex. B at 355–69). Attorney Davis argued Petitioner was "along for the ride; not his plan; not his connection; not his scheme" (*id.* at 356). Davis argued, "Without Mr. Thames, Ledarrious Washington still dies." (*id.*). Attorney Davis argued:

> You can't remove that cloak of innocence from Mr. Thames unless you are convinced beyond all reasonable doubt that:  Number 1. Ledarrious Washington's death was a consequence of attempted robbery and that he died during the course of that attempted robbery, and I submit to you that he didn't.

(Ex. B at 358).    Davis argued that the physical evidence showed that neither Petitioner nor Ledarrious Washington fired any shots, and that all of the fired shots came from Chamberlain's weapon (*id.* at 359–60).    Attorney Davis further argued that the crime of attempted robbery was abandoned and no longer taking place when Washington was killed (*id.* at 359–64).    Davis argued that Washington was wounded but still alive at the time the attempted robbery was abandoned, and Chamberlain ended Washington's life when he got out of the car and pumped eleven more shots into Washington's body (*id.*).    Attorney Davis argued that after Chamberlain shot Petitioner, and Petitioner fled the scene, Chamberlain "sets in motion a new series of consequences" (*id.* at 364).    Davis argued that Chamberlain made an independent, premeditated decision to shoot Washington eleven more times (*id.*).    Attorney Davis continued:

> What was this really a product of?
>
> Was it a product of Ledarrious Washington's scheme to rob Robert Boyd's dope connection, or was it started and was it a consequence of Nkosi Chamberlain's idea and plan to come to our town and sell his poisonous product?

Was it a robbery gone bad, an attempted robbery gone bad or was it a drug deal gone bad?

And that, ladies and gentlemen, is where it all started.  It started in Fort Walton.  But for Nkosi Chamberlain putting the mechanism in motion, okay, none of this would have happened.  There would have been no attempted robbery, but for the attempted drug sell.
. . . .
So he's guilty as charged if you believe everything that the State said and you don't consider anything that I have said.  Okay.  The attempted robbery was over.  Okay.  It was done.  My client was nowhere near there when that man was shot, killed and executed by Nkosi Chamberlain.  Abandonment, no abandonment.  He could not physically be part of that because he wasn't there.  He was—Boyd's words long gone.

But now, here is something else that you need to think about and I'm going to sit down.  All right.  You may say, well, you know what, Davis, I have listened to all of that, man, you are confusing me with of [sic] these consequences and all that, you know, did it start with a drug deal?  Did it start with attempted robbery?  You know, I don't know, man.

It was like Ledarrious Washington, when he was killed on the ground, okay, kind of feels like he was killed as a part of attempted robbery, if you are thinking that, but if you are thinking it was an attempted robbery by Mr. Thames, you're wrong.  If you're thinking he was killed as a part of an attempted robbery, that after Chamberlain got out of the car and executes him, then he goes through the dead or dying man's pocket.  Now, there's your attempted robbery.  There it is, folks.

Nkosi Chamberlain, why would he get out of the car when the man is already on the ground, dropped his weapon and was no longer a threat?  Why?  Why?  When all he has to do is drive back home.  There is no one there to stop him.  Why?  Because he wants to rob Ledarrious Washington.  He finishes him off and he goes through a dead man's pockets.  That's the death occurred [sic], if there was a death and he

attempted a robbery, Nkosi Chamberlain's attempted robbery of a man he killed that day, Ledarrious Washington.

The only verdict today, ladies and gentlemen, the only proper verdict is not guilty. That's it. For all the reasons that I laid out. That's it. That's the verdict. Think about it.

Hold the government to that exacting standard required for conviction. Don't vote with your gut, with your emotions. Don't confuse common sense and proper analysis, okay, with your emotions and all of that. Somebody has got to pay, and all of that. Your verdict today is not guilty. I have given you things that you can walk back there in that jury deliberation room, that you can hang your hat on. You can find him not guilty, and I have given you reasons why you should.

It's not something in the Land of Oz. It's not some magical stuff. It's not some smoke screen that I've thrown up. I've given you concrete, specific reasons why the State has not met its burden of proof. He's not guilty, ladies and gentlemen. That's it. He's not guilty.

(Ex. B at 365–69).

In this case, jurists of reason would not find it debatable whether Petitioner's Ground Four states a valid claim of the denial of his right to effective assistance of counsel—it does not. Anticipating the testimony and physical evidence that the State would present against Petitioner at trial, a competent defense attorney may want to concede certain facts to maintain credibility with the jury. Here, Attorney Davis conceded that Petitioner "got on board" with Ledarrious Washington's scheme to rob Chamberlain, but Davis emphasized that Washington was the leader, and Boyd and Petitioner were simply followers, and that Washington, Petitioner, and

Boyd did not discuss how Washington's scheme would unfold. Attorney Davis conceded that Petitioner and Washington walked up to Chamberlain's car holding guns, but Davis emphasized that the plan ended there, and that Washington's death was a consequence of Chamberlain's conduct after the robbery plan had been aborted. This was by no means an unreasonable trial strategy.

Furthermore, jurists of reason would not find it debatable whether Petitioner has stated a valid claim of prejudice. Petitioner contends counsel's conceding his guilt of attempted robbery without his consent was per se prejudicial under *United States v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984); therefore, he is not required to show prejudice under *Strickland* (*see* ECF No. 1 at 15; ECF No. 18 at 7). But the *Cronic* standard is only available in extreme circumstances where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Cronic*, 466 U.S. at 659. The "failure must be complete. . . . [C]ounsel [must] fail[ ] to oppose the prosecution throughout the . . . proceeding as a whole," rather than merely "at specific points" in the proceeding. *Bell v. Cone*, 535 U.S. 685, 697, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002). *Cronic* itself did not find defense counsel constitutionally deficient even though counsel in that case was a real estate attorney appointed to defend a complex mail fraud case with only twenty-five days to prepare a defense. 466 U.S. at 663; *see also Nixon*, 543 U.S. at 190

(describing the counsel in *Cronic* as "an inexperienced, underprepared attorney in a complex mail fraud trial").

Rather, the *Cronic* Court pointed to *Powell v. Alabama*, 287 U.S. 45, 53 S. Ct. 55, 77 L. Ed. 158 (1932), as a useful case in point. 466 U.S. at 660–61. In *Powell*, an out-of-state lawyer was appointed on the same day as the defendants' rape trial even after the lawyer informed the court that he was neither aware of the facts nor familiar with local procedure. 287 U.S. at 55. *Powell* thus presented an example where "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Cronic*, 466 U.S. at 659–60.

Such was not the case in Petitioner's trial. Putting aside Davis' opening statement to the jury, his performance throughout trial was not such that he effectively ceased to represent Petitioner. Attorney Davis cross-examined witnesses and objected to prejudicial evidence he thought was inadmissible (*see* Ex. B). Considering the trial record as a whole, Attorney Davis did not "entirely fail" to contest the prosecution's case against Petitioner. Therefore, prejudice is not presumed, and Petitioner must show a reasonable probability the result of trial would have been different if Attorney Davis had not conceded that Petitioner initially agreed to participate in the robbery of Chamberlain, which was planned by

Washington and arranged by Boyd, but then abandoned the plan before Chamberlain killed Washington.  Considering the evidence presented at Petitioner's trial, jurists of reason could not debate that Petitioner has not made a valid showing of *Strickland* prejudice.  Put another way, Petitioner has not made a valid showing that there is a reasonable probability the result of his trial would have been different if Attorney Davis had not conceded certain facts in his opening statement.

Petitioner has failed to show that the IATC claim asserted in Ground Four is a "substantial one" under the standard described in *Hittson*.  Therefore, Petitioner is not entitled to federal review of Ground Four under *Martinez*.

> B.   Ground Five:  "Petitioner received ineffective assistance of counsel in violation of the 6th and 14th Amendment [sic] of the U.S. Constitution due to counsel's failure to object and/or motion for mistrial because of the improper comments made by the prosecutor in closing arguments."

Petitioner contends Attorney Davis was ineffective for failing to object to sixteen comments made by the prosecutor during closing arguments (ECF No. 1 at 22–27).  Petitioner contends if counsel had objected, there is a reasonable probability the trial court would have either granted a mistrial or given a curative jury instruction which would have resulted in an acquittal (*id.* at 27).  As with Ground Four, Petitioner concedes he did not exhaust this IATC claim in the state courts, but he contends he is entitled to federal review under *Martinez* (*id.*).

Respondent contends Petitioner exhausted his IATC claim with respect to counsel's failure to object to the prosecutor's comments suggesting that the jury should convict Petitioner because Mr. Boyd pleaded guilty to the same offense (Petitioner identified these comments as Nos. 1 and 2 in his § 2254 petition) (ECF No. 14 at 41). Respondent contends Petitioner did not exhaust his IATC claim with respect to the other fourteen comments (*id.*). Respondent contends Petitioner failed to show he is entitled to federal review of his unexhausted claims under *Martinez*, because none of the prosecutor's remarks were improper (*id.* at 41–52).

In Petitioner's reply, he expressly abandons his challenge to thirteen of the sixteen comments (*see* ECF No. 18 at 10). He states he challenges only the comments he identifies as Nos. 1, 2, and 4 in his § 2254 petition (*id.* at 10–13).

    1.   <u>Comment Nos. 1 and 2</u>

Petitioner contends Attorney Davis should have objected to the following comments, because they improperly implied to the jury that Petitioner was guilty because Robert Boyd pleaded guilty to second degree felony murder, and undermined the presumption of innocence:

> Another place where your common sense should come into play is with Mr. Boyd, not necessarily with the testimony of Mr. Boyd, but of his status. Mr. Boyd touched no gun that day. Mr. Boyd pointed no gun at anybody that day. Mr. Boyd sent some text messages, admittedly, knowing that there was going to be a robbery.

Mr. Boyd entered a plea to the same charge that Javontai Thames
is facing, second degree felony murder.  He plead to the exact same
charge.  No deal.  No promises.  No requirement that he testify.

And I asked him, I said, why did you plea?  I said, was it because
you did it?

He said, yeah, we did it.  It was a robbery.

It was an attempted robbery and that robbery led to the death of
Mr. Washington.  Why should it apply any differently to Mr. Thames?
. . . .
And legal abandonment doesn't apply.  So he's trying to come
up with this—whatever this other legal theory is, of, oh, Mr. Thames
wasn't there, so he's not guilty.  Boyd wasn't there.  Boyd was yards
hundreds of yards away in the park—hundred yards away in the park.
He wasn't there.  He's guilty.

(*see* ECF No. 1 at 22–23 (citing Ex. B at 343, 370)).

Petitioner presented this IATC claim as Ground Four of his Rule 3.850 motion

(Ex. I at 28–31).  The state circuit court adjudicated the claim as follows:

As a general principle, to prevail on a claim of ineffective
assistance of counsel, a defendant must demonstrate that 1) counsel's
performance was deficient, and 2) there is a reasonable probability that
the outcome of the proceeding would have been different had counsel
not been deficient.  See Torres-Arboleda v. Dugger, 636 So. 2d 1321,
1324 (Fla. 1994), construing Strickland v. Washington, 466 U.S. 668
(1984).  Thus, there is a two-part inquiry:  counsel's performance and
prejudice.

In reviewing counsel's performance, the court must be
highly deferential to counsel, and in assessing the
performance, every effort must "be made to eliminate the

distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."

Spencer v. State, 842 So. 2d 52, 61 (Fla. 2003), quoting Strickland, 466 U.S. at 689.

Defendant bears the burden of showing that counsel's errors were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687. There is a "wide range of professionally competent assistance" that passes this constitutional muster. Bertolotti v. State, 534 So. 2d 386, 387 (Fla. 1988). Furthermore, there is a "strong presumption that counsel has rendered adequate assistance and made all significant decisions in the exercise of *reasonable professional judgment* with the burden on claimant to show otherwise." Blanco v. Wainwright, 507 So. 2d 1377, 1381 (Fla. 1987), quoted in Bertolotti, 534 So. 2d at 387 (emphasis added).

Even if Defendant's counsel fell below such standards, Defendant would not automatically prevail. Defendant must also meet the prejudice prong of the Strickland test.[FN 2] For Defendant to prevail on this point, he must demonstrate that there is a "reasonable probability that, but for the deficiency, the result of the proceeding would have been different." Spencer, 842 So. 2d at 61. Moreover, "[a] court considering a claim of ineffective assistance of counsel need not determine whether counsel's performance was deficient *when it is clear that the alleged deficiency was not prejudicial*." Torres-Arboleda, 636 So. 2d at 1324 (emphasis added). In other words, Defendant must demonstrate a "probability sufficient to undermine confidence in the outcome." Spencer, 842 So. 2d at 61. With these principles in mind, the Court will address Defendant's claims.

[FN 2: there is no prescribed sequence for the Strickland analysis, but if a defendant does not carry his burden on

one prong, then the Court need not consider the other prong. See Strickland, 466 U.S. at 697.]

. . . .

Lastly, Defendant asserts that his counsel was ineffective for failing to object to certain comments by the State during opening statements and closing arguments. During opening statements, the State informed the jury that Mr. Boyd had entered a plea to his charges in the case, and again remarked on Mr. Boyd's guilty plea during closing arguments. Defendant argues that it was improper for the State to show that a co-defendant pleaded guilty because of a potential prejudicial effect, and that his counsel should have objected and requested a cautionary instruction and/or a mistrial. Defendant writes that he was prejudiced because the comments "suggested to the jury that because [Boyd] accepted responsibility in the second-degree felony murder death of [ ] Washington, Defendant should also be held responsible." Had counsel objected, Defendant concludes that the objection would have been sustained and a mistrial granted.

Defendant has failed to show that he was prejudiced by any failure of counsel to object to this information. Defendant does not contest his involvement in the attempted robbery; indeed the evidence was overwhelming at trial that he was involved, as he was discovered wounded at the scene, Mr. Boyd testified to his [Petitioner's] involvement, and his fingerprint was found on a gun at the scene. Rather his defense focused on the independent acts of Nkosi Chamberlain. Furthermore, his counsel used the fact that Boyd had not yet been sentenced at the time of trial to suggest that Boyd's testimony was a result of his attempt to curry benefits at the time of his sentencing. The instant case is similar to Bell v. State, 965 So. 2d 48, 56–57 (Fla. 2007), and the Court finds the holding in Bell to be applicable in the instant case. The Court in that case concluded as follows:

> At Bell's trial, the prosecutor stated in his opening argument that Dale George pled guilty to the charge of accessory after the fact for the instant crime and that he negotiated an agreement with the State that in exchange for his testimony, he would receive a prison sentence of no

more than five years.  At the start of George's testimony, he admitted that he pled guilty to this charge and detailed the terms of his agreement.   The prosecutor reiterated these facts in his closing argument.  Bell argues that his trial counsel should have objected to any statements about George pleading guilty to participating in the crime because such statements implied that Bell was also guilty.

The circuit court denied this claim, finding that the prosecutor's comments about George's plea were "legitimate comments on the evidence anticipated and presented at trial, and were not improper."  Postconviction Order at 3.

In support of his argument to the circuit court and to this Court on appeal, Bell cites to several cases in support of his claim that trial counsel should have objected to the prosecutor's statements concerning George's plea. However, in each of the cases cited by Bell, the accomplice whose plea was referenced had not testified at trial.  *See Bruton v. United States*, 391 U.S. 123, 137, 88 S. Ct. 1620, 20 L. Ed. 2d 4 76 (1968) (codefendant's confession inadmissible against defendant because since codefendant did not testify, right to confrontation was violated); *Parker v. State*, 458 So. 2d 750, 753 (Fla. 1984); *Thomas v. State*, 202 So. 2d 883, 884 (Fla. 3d DCA 1967); *Moore v. State*, 186 So. 2d 56 (Fla. 3d DCA 1966).

Evidence that a witness has received a lighter sentence in exchange for his or her testimony goes to the bias of the witness and is therefore a proper subject for impeachment. § 90.608, Fla. Stat. (1995).  The State addressed these matters in an effort to fully disclose the terms of the plea agreement, in anticipation of trial counsel's cross-examination of George.  We have held that there is no violation of the Florida Evidence Code when a party

> attempts to "mitigate the impact of inconsistent statements likely to be introduced, nor anything intrinsic to the jury's truth-finding function in an arbitrary requirement that opposing counsel's trial strategy may not be undercut." *Bell v. State*, 491 So. 2d 537, 538 (Fla. 1986). The State clearly could anticipate that competent trial counsel would introduce the details of any plea agreement exchanged for a witness testifying against the defendant. Thus, we affirm the circuit court's finding that Bell failed to demonstrate that trial counsel was ineffective for failing to object to these legitimate comments on the evidence presented at trial.

Bell v. State, 965 So. 2d 48, 56–57 (Fla. 2007).

> Defendant has failed to show that his counsel was ineffective, or that he was prejudiced as a result of the alleged ineffectiveness. He is not entitled to relief on the basis of this final claim.

(Ex. I at 34–35, 40–41 (references to trial transcript omitted)). The First DCA affirmed the circuit court's decision without comment.

In *Wilson v. Sellers*, — U.S. —, 138 S. Ct. 1188, 200 L. Ed. 2d 530 (2018), the Supreme Court held that where there has been one reasoned state judgment rejecting a federal claim followed by a later unexplained order upholding that judgment or rejecting the same claim, federal habeas courts employ a "look through" presumption. The *Wilson* Court described this presumption as follows:

> We hold that the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may

rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

*Id.* at 1192.

Under Florida law, the standard for reviewing prosecutorial comments is the following:

Wide latitude is permitted in arguing to a jury. Logical inferences may be drawn, and counsel is allowed to advance all legitimate arguments. The control of comments is within the trial court's discretion, and an appellate court will not interfere unless an abuse of such discretion is shown. A new trial should be granted when it is "reasonably evident that the remarks might have influenced the jury to reach a more severe verdict of guilt than it would have otherwise done." Each case must be considered on its own merits, however, and within the circumstances surrounding the complained-of remarks.

*Breedlove v. State*, 413 So. 2d 1, 8 (Fla. 1982) (quoting *Darden v. State*, 329 So. 2d 287, 289 (Fla. 1976)) (other citations omitted). This state rule is essentially the same as the federal due process standard governing allegedly improper argument by the prosecution. A prosecutor may argue both facts in evidence and reasonable inferences from those facts. *See Tucker v. Kemp*, 762 F.2d 1496, 1506 (11th Cir. 1985) (citations omitted). But if the evidence is too insubstantial to support a reasonable inference, the prosecutor's comment will be deemed improper. *Id.* at 1507. Prosecutors must observe the distinction between the permissible practice of

arguing evidence and suggesting inferences which the jury may reasonably draw from it and the impermissible practice of arguing suggestions beyond the evidence. *See United States v. Simon*, 964 F.2d 1082, 1086 (11th Cir. 1992) (citation omitted).

Further, the prosecutor is not limited to a bare recitation of the facts; he may comment on the evidence and express the conclusions he contends the jury should draw from the evidence. *United States v. Johns*, 734 F.2d 657, 663 (11th Cir. 1984). A prosecutor may comment on the uncontradicted or uncontroverted nature of the evidence and may point out that there is an absence of evidence on a certain issue during closing argument to the jury. *See White v. State*, 377 So. 2d 1149 (Fla. 1980). Additionally, prosecutorial comment upon a general lack of defense evidence is permissible. *See Smiley v. State*, 395 So. 2d 235 (Fla. 1st DCA 1981).

The prosecutor may not, however, "'inflame the minds and passions of the jurors so that their verdict reflects an emotional response to the crime or the defendant rather than the logical analysis of the evidence in light of the applicable law.'" *Jones v. State*, 612 So. 2d 1370, 1374 (Fla. 1993) (quoting *Bertolotti v. State*, 476 So. 2d 130 (Fla.1985)).

"[T]he limits of proper argument find their source in notions of fairness, the same source from which flows the right to due process of law." *Houston v. Estelle*, 569 F.2d 372, 380 (5th Cir. 1978). Thus, to establish prosecutorial misconduct, a

two-prong test must be satisfied:  (1) the prosecutor's comments must have been improper; and (2) the comments must have prejudicially affected the substantial rights of the defendant.  *See United States v. Wilson* , 149 F.3d 1298, 1301 (11th Cir. 1998); *Dessaure v. State*, 891 So. 2d 455, 464–65 (Fla. 2004) (an order granting mistrial is required only when the error upon which it rests is so prejudicial as to vitiate the entire trial, making a mistrial necessary to ensure that the defendant receives a fair trial).  "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would be different." *Wilson*, 149 F.3d at 1301 (internal quotations and citation omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *United States v. Eyster*, 948 F.2d 1196, 1207 (11th Cir. 1991).

With respect to a defense attorney's failure to object to a prosecutor's comments, "[a]n objectively reasonable trial lawyer could . . . prefer not to make objections during closing argument unless the objection is a strong one." *Holland v. Florida*, 775 F.3d 1294, 1317 (11th Cir. 2014) (internal quotation marks and citation omitted).

Where a codefendant is a witness at trial, subject to the rigors of cross-examination, disclosure of the guilty plea to blunt the impact of attacks on his

credibility serves a legitimate purpose and is permissible. *United States v. Griffin*, 778 F.2d 707, 710 n.5 (11th Cir. 1985) (a prosecutor is permitted to bring up questions relating to a guilty plea where a co-defendant takes the witness stand); *United States v. King*, 505 F.2d 602, 607 (5th Cir. 1974).

Anticipating an attack on the credibility of its star witness, Robert Boyd, the prosecutor in Petitioner's case brought out in advance, during his opening statement, the fact that Boyd had entered a plea to the same charge, in order to eliminate the impression that the State may be trying to hide Boyd's possible motive or interest in testifying at Petitioner's trial. During the prosecutor's opening, the prosecutor commented as follows on Robert Boyd's guilty plea:

> Mr. Boyd got arrested with and charged with the exact same thing that Mr. Thames is charged with, second-degree felony murder.
>
> Mr. Boyd had—had a trial scheduled. Prior to going to trial, Mr. Boyd entered a plea. He pled to the charge based on his involvement in setting up the robbery that led to the death of Mr. Washington. And I expect that you'll hear testimony from Mr. Boyd today or early tomorrow about the events that led up to this robbery attempt, that ultimately led to the death of Mr. Washington.

(Ex. B at 124).

Robert Boyd took the witness stand, so the prosecutor was permitted to ask him whether he was arrested and charged with the same offense as Petitioner, whether he entered a plea, why he entered a plea and whether he did so pursuant to

"any type of deal," whether he received any guarantee or promise with respect to his sentence, and whether his plea was contingent upon his testifying at Petitioner's trial (Ex. B at 190, 206–07). Boyd answered those questions, stating (1) he did not receive any type of "deal" from the State, (2) he did not receive any promise or guarantee with respect to his sentence, (3) his plea was not contingent on his testifying at Petitioner's trial, and (4) he entered a plea because "it wasn't no point [sic] in taking it to trial," because he was involved in setting up a robbery (*id.* at 206–07).

On cross-examination, Attorney Davis elicited Boyd's testimony that he entered his plea in front of the same judge presiding at Petitioner's trial, and that the same judge would sentence Boyd (Ex. B at 225–26). Davis elicited Boyd's admission that he was hoping he could help himself by testifying at Petitioner's trial (*id.* at 226).

During closing arguments, the prosecutor made the comments which Petitioner contends were improper as "undermin[ing] Petitioner's presumption of innocence"; more specifically, as noted above, the prosecutor commented:

> Another place where your common sense should come into play is with Mr. Boyd, not necessarily with the testimony of Mr. Boyd, but of his status. Mr. Boyd touched no gun that day. Mr. Boyd pointed no gun at anybody that day. Mr. Boyd sent some text messages, admittedly, knowing that there was going to be a robbery.

Mr. Boyd entered a plea to the same charge that Javontai Thames is facing, second degree felony murder. He plead to the exact same charge. No deal. No promises. No requirement that he testify.

And I asked him, I said, why did you plea? I said, was it because you did it?

He said, yeah, we did it. It was a robbery.

It was an attempted robbery and that robbery lead to the death of Mr. Washington. Why should it apply any differently to Mr. Thames?

(Ex. B at 343).

As part of Attorney Davis' closing argument, he argued that Robert Boyd, Nkosi Chamberlain, and Ledarrious Washington were the three players in this crime:

But for Robert Boyd being the conduit for Nkosi Chamberlain to bring his dope to our community and trying to buy guns off the street, Ledarrious Washington would still be alive. But for Nkosi Chamberlain, who wanted to come to our community and sell his poison and buy guns, Ledarrious Washington would still be alive. But for Ledarrious Washington, his own conduct, furnishing weapons and coming up with a scheme to rob Nkosi Chamberlain when he was in our town, Mr. Washington would still be alive.

These players, the three I just named, two of them have interchangeable parts. Chamberlain and Boyd are either the puppet or the puppeteer, depending upon what's going on in their head.

You see, Chamberlain thinks he's orchestrating a drug deal in Fort Walton, and he's going to come up here and make a little money and take some fire back to his town. Okay.

Washington, okay, he thinks he's the puppeteer.  He thinks that he's going to work Chamberlain and do this robbery.

And what is Boyd?  Boyd's the strings.  Okay.  Without either of these three players, none of this goes down.

But what's Javontai Thames' role?  Is he an integral part of this?  Can it all happen without him?  Of course.  He's basically along for the ride; not his plan; not his connection; not his scheme.  Okay.  Without Mr. Thames, Ledarrious Washington still dies.
. . . .
Boyd tells you, the minute Mr. Thames is shot, he flinches as if hurt, leaves his weapon where it's found and takes off running like a rabbit.  Okay.  And that he's on the way around the corner.  Okay.

And keep in mind now, Boyd, while all of this is happening quickly, Boyd is in a safe zone.  You see, he's not in the line of fire, and he can sit there and watch all of this as it goes down.  Boyd's calm.  He's cool.  He's collected.  He's ain't [sic] no choir boy.  Come on, man, he met Chamberlain in juvenile detention.  Those home boys, those cats, you know, and he gets up here and he's not confrontational.  It's just another day at the office for him, you know, testifying.  Okay.

So he's watching all of this—this thing unfold.  He sees his cousin run around the corner wounded, unarmed and—Barn.  Barn.  That's when he says Chamberlain shoots Mr. Washington.

(Ex. B at 355–56, 361–62).

In the prosecutor's responsive argument, he argued:

So he's trying to come up with this—whatever this other legal theory is, of, oh, Mr. Thames wasn't there, so he's not guilty.  Boyd wasn't there.  Boyd was yards hundreds of yards away in the park— hundred yards away in the park. He wasn't there.  He's guilty.

(Ex. B at 370).

Case No.:  3:18cv1547/MCR/EMT

Notably, prior to closing arguments, the trial court instructed the jury, "Please remember that what the attorneys say is not evidence." (Ex. B at 333).  And after closing arguments, the court instructed the jurors that the case must be decided only upon the evidence they heard from the testimony of witnesses and saw in the form of exhibits and evidence, and the jury instructions (*id.* at 382, 385).

In the undersigned's view, the state court unreasonably applied *Strickland* in determining that Attorney Davis' failure to object to Comments 1 and 2 was reasonable, as the prosecutor's comments went well beyond a disclosure of Boyd's guilty plea and the related arguments that could have been made (i.e., that Boyd had no deal with the State, that no promises had been made to him, and that his plea was not contingent upon his testifying at Petitioner's trial).  However, the state court's assessment of the prejudice prong was reasonable.  Considering the ample evidence of Petitioner's guilt (most notably, his admission to Deputy Infinger that Robert Boyd had set up the drug deal for Nkosi Chamberlain to come over so that they could rob him; and the evidence that Petitioner's fingerprint was on the .22 caliber Remington rifle containing a live round, which was found at the scene of the shooting), and considering the trial court's instructions to the jury to consider only the evidence and not the attorneys' comments, the state court reasonably concluded Petitioner failed to show a reasonable probability the outcome of trial would have

been different if Attorney Davis had objected to Comments 1 and 2, or moved for a mistrial, or both.  Therefore, Petitioner is not entitled to federal habeas relief on his part of Ground Five.

>    2.    Comment No. 4

The parties do not dispute that Petitioner did not exhaust his IATC claim based upon Attorney Davis' failure to object to the following comment by the prosecutor, "And what Mr. Chamberlain did is—as far as killing Mr. Washington, was terrible. No doubt about it.  There is no getting around that.  And did Mr. Chamberlain go too far in his actions?  *Frankly, that will be for another jury to decide, with another prosecutor trying the case on another day*." (ECF No. 1 at 23 (emphasis in original)). The parties dispute whether Petitioner is entitled to federal review of this IATC claim under *Martinez*.

Petitioner contends the prosecutor's comment was improper because it "invaded the province of the jury, and/or may have caused them to weigh the evidence impartially" (ECF No. 1 at 23).   Petitioner contends the comment undermined his defense theory, that Chamberlain was responsible for Washington's death, and that Washington was not killed while an attempted robbery was still being committed (*id.*).

That a prosecutor's comment undermines a defense theory is not improper. Furthermore, it is not improper for the prosecutor to encourage the jury to weigh the evidence impartially.  It is improper for the prosecutor to invade the factfinding province of the jury, but the prosecutor's comment (i.e., that the issue of whether Chamberlain "went too far" by killing Washington would be decided by a different jury) did not do that.  It was not the province of Petitioner's jury to determine Mr. Chamberlain's guilt.

Jurists of reason could not debate that Petitioner has not made a valid showing of deficient performance by Attorney Davis for failing to object to this comment; nor could jurists of reason debate that Petitioner has not made a valid showing of *Strickland* prejudice.  Petitioner has failed to show that the IATC claim based upon counsel's failure to object to comment identified as No. 4 in Ground Five is a "substantial one" under the standard described in *Hittson*.  Therefore, Petitioner is not entitled to federal review of this IATC claim under *Martinez*.

To summarize, Petitioner has failed to demonstrate that the state court's adjudication of his IATC claim regarding defense counsel's failure to object to the prosecutorial comments identified as No. 1 and No. 2 of Petitioner's § 2254 petition was contrary to or an unreasonable application of *Strickland*.  With respect to the prosecutor's comment identified as No. 4, Petitioner has not presented a

"substantial" IATC claim for purposes of obtaining federal review under *Martinez*.

Therefore, Petitioner is not entitled to relief on Ground Five.

C.  Ground Six:  "Petitioner received ineffective assistance of counsel in violation of the 6th and 14th Amendment [sic] of the U.S. Constitution due to counsel's failure to object to the misleading and confusing Independent Act Jury Instruction."

Petitioner contends Attorney Davis was deficient for failing to object to the

Independent Act jury instruction as misleading and confusing (ECF No. 1 at 28–29).

Petitioner contends the jury instruction included the following misleading and

confusing language, which Petitioner emphasizes in italics:

> If you find that the crime alleged was committed, an issue in this case is whether the crime was an independent act of a person other than the defendant.  An independent act occurs when a person other than the defendant commits or attempts to commit a crime:
>
> 1.    Which the defendant did not intend to occur, and
>
> 2.    In which the defendant did not participate, and
>
> 3.    Which was outside of and not a reasonably foreseeable consequence of the common design or unlawful act contemplated by the defendant.
>
> *If you find the defendant was not present when the crime occurred, that, in and of itself, does not establish that the Second Degree Felony Murder was an independent act of another.*
>
> *If you find that the death of Ledarrious Washington was the result of the independent act of Nkosi Chamberlain*, then you should

find Javontai Thames not guilty of the crime of Second Degree Felony
Murder.

(ECF No. 1 at 28–29; ECF No. 18 at 15).   Petitioner alleges there was no possible

way Nkosi Chamberlain could be guilty of second degree <u>felony</u> murder, so defense

counsel should have argued that the instruction "needed to be phrased another way

and/or state the crime that Nkosi Chamberlain was accused of, which was Second

Degree Murder and the elements of that charge" (ECF No. 1 at 29; *see also* ECF No.

18 at 15).   Petitioner concedes he did not present this IATC claim in his Rule 3.850

motion (ECF No. 1 at 30).   He contends he is entitled to federal review of his IATC

claim under *Martinez* (ECF No. 1 at 30; ECF No. 18 at 14–16).

Respondent contends Petitioner is not entitled to federal review under

*Martinez*, because his underlying IATC claim is not a "substantial" one (ECF No.

14 at 53–56).

Florida's standard independent act instruction read as follows:

If you find the crime alleged was committed, an issue in this case is
whether the crime of (crime alleged) was an independent act of a person
other than the defendant.   An independent act occurs when a person
other than the defendant commits or attempts to commit a crime

     1. which the defendant did not intend to occur, and

     2. in which the defendant did not participate, and

> 3. which was outside of and not a reasonably foreseeable consequence of the common design or unlawful act contemplated by the defendant.
>
> *If you find the defendant was not present when the crime of (crime alleged) occurred, that, in and of itself, does not establish that the (crime alleged) was an independent act of another.*
>
> *If you find that the (crime alleged) was an independent act of [[(name of individual)],* then you should find (defendant) not guilty of the crime of (crime alleged).

*See* Fla. Standard July Instruction in Criminal Cases, Chp. 3, Final Charge to the Jury, 3.6(l) Independent Act (adopted July 1997) (italics added to indicate language which is the subject of Ground Six).

The trial transcript shows that the independent act instruction was thoroughly discussed during the charge conference (Ex. B at 309–16). Attorney Davis, the prosecutor, and the court extensively discussed the fact that Nkosi Chamberlain was charged with second degree murder, which was not the crime alleged against Petitioner, i.e. second degree felony murder; therefore, the language of the standard instruction did not apply (Ex. B at 309–16). Specifically with respect to the language at issue in Ground Six, the parties discussed it as follows:

> MR. DAVIS: Judge, I would suggest this thing can be remedied by simply stating "felony murder"
>
> MR. GADDY [the prosecutor]: So whether the crime of felony murder was an independent act of a person?

MR. DAVIS: Yes.

MR. GADDY: Then when you go on to the next page, it would read: If you find the defendant was not present when the crime of felony murder occurred, that in and of itself does not establish that the crime was an independent act of another. I mean, maybe we can just insert the word "crime".

MR. DAVIS: The charged crime—would we like, the charged crime or the crime as charged in the Information?
. . . .

MR. GADDY: What if we just eliminated the charge altogether? Just say: The crime alleged was committed. An issue in this case is whether the crime was an independent act of another person.

MR. DAVIS: I think that's an excellent way to remedy it.

THE COURT: . . . .You're okay with the more generalized language of just "crime"?

MR. GADDY: Right. . . . I think that the goal of the instruction is to let the jury determine if the independent actions of another trump the actions of Mr. Thames. And I think that by eliminating the specifics we accomplice that goal.

THE COURT: Do you agree?

MR. DAVIS: Well, I'm just wondering if perhaps the crime alleged in Count 1 of the State's Information—

MR. GADDY: If that's what you're asking for, I understand, but then I think you get to the problem of the jury getting back there and looking at the elements of what Count 1 is and they would clearly see that Nkosi Chamberlain doesn't meet those elements.

MR. DAVIS:  Right. I agree with that.  I think the crime—I think is a fair—it's fair, us meeting in the middle, and a very unusual factual scenario and charge, so . . .

THE COURT:  And I'll just confirm that Nkosi Chamberlain appears to be charged with second degree murder with a weapon; aggravated assault with a deadly weapon, those are the charges that he's facing.

I think if y'all agree to it—let's take a look at it once . . . .

MR. DAVIS:  Again, on behalf of the defendant, Judge, this is, again, unusual.  We don't really have any case law guidance on this and I think this is an excellent way to get the result that we want, which is the instruction.

THE COURT:  Okay. I understand.

MR. GADDY:  What about this last paragraph, Ron [Davis]?  If you find that the second degree felony murder was an independent act of Nkosi Chamberlain—do you agree with that?

MR. DAVIS:  Well, that's problematic.

MR. GADDY:  You want to change it to the "crime" again?

MR. DAVIS:  Right.

THE COURT:  I think if you say:  If you find that the crime was an independent act of Nkosi Chamberlain, then you should find Javontai Thames not guilty of the crime of second degree murder.  I think if you stick with the same crime—the word "crime", I think it gets us where we want to be because otherwise, it's suggesting that Nkosi Chamberlain is guilty of second degree felony murder or it was his act, and we just said he's not charged with that and the elements don't match that.

So I think sticking with the word "crime" at the first part and then leaving Javontai Thames and second degree felony murder because that's what he is charged with, Javontai Thames.

. . . .

Let's just take a look together I guess Mr. Davis has looked at it, but let me come down there and look at what you have changed and read it.

The other suggestion on that last paragraph, from our staff attorney is:  If you find that death of Ledarrious Washington was the result of an independent act of Nkosi Chamberlain—that's another way to put it.

MR. DAVIS:  I like that language because that removes the ambiguity of crime, and here we are alleging there are several crimes going on:  Potential sale of drugs, purchase of drugs, attempted robbery, aggravated batteries, although that's not alleged in the Information or it won't be a lesser, but—so death does—

THE COURT:  What do you think about that—

MR. GADDY:  I agree.

(Ex. B at 311–16).

So the prosecutor, Attorney Davis, and the trial court agreed that the standard

independent act instruction would be modified to read as follows:

If you find that the crime alleged was committed, an issue in this case is whether the *crime* was an independent act of a person other than the defendant.  An independent act occurs when a person other than the defendant commits or attempts to commit a crime:  Which the defendant did not intend to occur, and in which the defendant did not participate, and which was outside of and not a reasonably foreseeable consequence of the common design or unlawful act contemplated by the defendant.

> If you find the defendant was not present when the *crime* occurred, that, in and of itself, does not establish that the Second Degree Felony Murder was an independent act of another.

> If you find that the *death* of Ledarrious Washington was the result of the independent act of Nkosi Chamberlain, then you should find Javontai Thames not guilty of the crime of Second Degree Felony Murder.

(Ex. B at 380) (italics indicating the changes to the language of the standard instruction).

Petitioner does not dispute that Attorney Davis was correct in arguing that the language of the standard instruction was misleading and confusing, but Petitioner disagrees with Davis' choice of substitute language.  Petitioner appears to argue that the last two paragraphs should have read:

> If you find the defendant was not present when the crime occurred, that, in and of itself, does not establish that the *Second Degree Murder* was an independent act of another.

> If you find that the *Second Degree Murder* of Ledarrious Washington was an independent act of Nkosi Chamberlain, then you should find Javontai Thames not guilty of the crime of Second Degree Felony Murder.

(*see* ECF No. 1 at 29; ECF No. 18 at 15).

No reasonable jurist could debate that Attorney Davis made a tactical decision regarding the language of the independent act instruction.  Petitioner's suggestion

that alternative language could have been used cannot overcome the presumption that, under the circumstances, Attorney Davis' decision might be considered sound trial strategy. Additionally, jurists of reason would not find it debatable whether Petitioner has stated a valid claim of prejudice. Petitioner's proposed language did not make the jury instruction any more clear than the language agreed upon by Attorney Davis. There is simply no merit to Petitioner's speculative assertion that there is a reasonable probability the jury would not have convicted him of second degree felony murder if his suggested language had been used in the independent act instruction, instead of the language to which Attorney Davis agreed.

Petitioner has not stated a substantial IATC claim with respect to Attorney Davis' agreement with the language of the modified independent act instruction. Therefore, he is not entitled to federal review of Ground Six under *Martinez*.

D.    Ground Ten: "Petitioner received ineffective assistance of counsel in violation of the 6th and 14th Amendment [sic] of the U.S. Constitution due to counsel's failure to adequately investigate and call Donzaleigh Patterson as a witness."

Petitioner alleges Donzaleigh Patterson gave a recorded statement to investigator Kevin Cox on August 1, 2013 (ECF No. 1 at 43–44). Petitioner attached a transcript of Ms. Patterson's statement to his reply (ECF No. 18, Ex. A). Ms. Patterson stated she was upstairs putting clothes in the dryer when she heard a "'pop'

popping sound" (*id.*). Ms. Patterson stated she then heard another shot (*id.*). She stated she ran to the window and saw two men running around in a circle firing guns at each other (*id.*). Ms. Patterson stated:

> They kept running around, around and shooting, the one the one that was out there in the ground I don't know his name or whatever, he dropped he fell then we that's [sic] then we that's [sic] when we assumed he got shot. That when [sic] we started screaming oh no, oh no, at this time at had [sic] my phone and I was trying to dialed [sic] the police. Then the guy, the other guy I don't know what he was doing, the other guy that it [sic] was chasing him it's like he kneeled down and he did something then he got back in the car and he got back out of the car and he shot again then he jumped and [sic] the car and he left. When he speeded off we all went downstairs to go check on the guy.

(ECF No. 18, Ex. 18). Ms. Patterson stated that the man being chased had dreadlocks, and the man chasing him had a "low haircut" (*id.*). Ms. Patterson stated the two men were running around a black car, which was the same car in which the man with the low haircut left the scene (*id.*). Ms. Patterson stated the man with dreadlocks was still waving his gun around even when he was on the ground, as if he was attempting to shoot (*id.*). Ms. Patterson stated when she went downstairs, the man with dreadlocks lying on the ground was still breathing (*id.*).

Petitioner alleges if Attorney Davis had presented Ms. Patterson's testimony, it would have established that Ledarrious Washington's death occurred after the attempted robbery was over and was thus the result of Nkosi Chamberlain's

independent act (ECF No. 1 at 44; ECF No. 18 at 19).  Petitioner alleges there is a reasonable probability he would not have been convicted of second degree felony murder if Davis had called Ms. Patterson as a witness (*id.*).  Petitioner concedes he did not present this IATC claim in his Rule 3.850 motion (ECF No. 1 at 44–45).  He contends he is entitled to federal review of his claim under *Martinez* (ECF No. 1 at 44–45; ECF No. 18 at 18–19).

Respondent contends Petitioner is not entitled to federal review under *Martinez*, because his underlying IATC claim is not a "substantial" one (ECF No. 14 at 68–72).

Reasonable jurists could not disagree that Petitioner has not stated a valid claim of prejudice under *Strickland*.  Ms. Patterson's description was essentially the same as Robert Boyd's description during his trial testimony, with the only difference being that according to Ms. Patterson, Nkosi Chamberlain re-entered and exited his car <u>twice</u> to continue shooting Ledarrious Washington.  Jurists of reason could not disagree that there is no reasonable probability this additional fact would have caused the jury to accept the independent act theory and find reasonable doubt as to Petitioner's guilt of second degree felony murder, as Petitioner suggests.

Petitioner has not stated a substantial IATC claim in Ground Ten.  Therefore, he is not entitled to federal review of his claim under *Martinez*.

E.    Ground Thirteen:  "Petitioner received ineffective assistance of counsel in violation of the 6th and 14th Amendment [sic] of the U.S. Constitution due to counsel arguing an illegal theory of defense during trial."

Petitioner contends Attorney Davis was ineffective for presenting an "abandonment" theory of defense, for example, by asking Robert Boyd if Petitioner abandoned his weapon by dropping it on the ground, and if Petitioner "abandoned whatever plan Ledarrious had cooked up" by running away (ECF No. 1 at 51–52). Petitioner contends he was prejudiced by Davis' pursuing an abandonment theory, because the prosecutor argued during closing arguments that the theory did not apply, then Attorney Davis argued a different defense theory, and then the prosecutor capitalized on the fact that defense counsel changed his theory (*id.*). Petitioner contends Attorney Davis should have spent more time arguing one or both of the following theories:  (1) Washington's death did not occur as a consequence of, and while there was an attempt to commit, a robbery; and (2) Washington's death was caused by Chamberlain's independent act (i.e., Chamberlain was responsible for Washington's death and/or Petitioner was not present when Washington was killed) (*id.*).  Petitioner asserts if Attorney Davis had included these arguments in his motion for judgment of acquittal ("JOA") and closing arguments, there is a reasonable probability Petitioner would not have been convicted (*id.*).

Petitioner concedes he did not exhaust Ground Thirteen (ECF No. 1 at 52). He argues he is entitled to federal review through *Martinez* (*id.*).

Respondent did not address Ground Thirteen as a separate claim in its answer to the § 2254 petition, but Respondent did address Grounds Two and Three (*see* ECF No. 14 at 28–33). Grounds Two and Three assert IATC claims based upon Attorney Davis' failure to argue an "independent act" theory and a "sufficiency of the evidence" theory in his motion for JOA (*see* ECF No. 1 at 11, 13).

In Petitioner's reply, he requests an evidentiary hearing on this claim, since Respondent did not separately address it in its answer (ECF No. 18 at 21).

Upon preliminary review of the parties' pleadings, this court ordered Petitioner to file a supplemental reply explaining the difference between Ground Thirteen and Grounds Two and Three (ECF No. 20). The court instructed Petitioner that if he conceded that Ground Thirteen was essentially the same as Grounds Two and Three, he must state whether he concedes he is not entitled to habeas relief on Ground Thirteen, because he conceded he was not entitled to relief on Grounds Two and Three (*id.*). To date, Petitioner has not responded to the court's order.

The undersigned concludes that to the extent Ground Thirteen is based upon Attorney Davis' failure to argue, in his motion for JOA, an "independent act" theory and a "sufficiency of the evidence" theory, the claim is subsumed by Grounds Two

and Three, and the court will not address it further in light of Petitioner's concession he is not entitled to relief.

To the extent Petitioner contends in Ground Thirteen that Attorney Davis was ineffective for suggesting an abandonment theory during his cross-examination of Robert Boyd, Petitioner has not stated a substantial IATC claim.  Attorney Davis asked Boyd whether Petitioner "abandoned his weapon" when Nkosi Chamberlain shot him (Ex. B at 222–23).  Boyd answered, "Yes, sir" (*id.*).  Davis then asked, "And when he [Petitioner] took off running away, he abandoned whatever plan Ledarrious had cooked up, correct?" (*id.* at 223).  The court sustained the prosecutor's objection (on the ground that it asked for a legal conclusion), and Davis then asked, "In any event, he took off running, didn't he" (*id.*).  Mr. Boyd responded, "Yes, sir" (*id.*).

Jurists of reason could not disagree that Attorney Davis was not incompetent for asking Boyd about Petitioner's abandoning his weapon and fleeing the scene. Further, jurists of reason could not disagree that there is no reasonable probability the result of Petitioner's trial would have been different if Attorney Davis had not asked these questions of Robert Boyd.  Petitioner has not stated a substantial IATC claim with respect to counsel's cross-examination of Boyd on these matters.

Therefore, Petitioner is not entitled to further federal review of this aspect of Ground Thirteen under *Martinez*.

Finally, to the extent Petitioner contends in Ground Thirteen that defense counsel was ineffective for failing to argue "sufficiency of the evidence" and "independent act" theories in his closing argument, the IATC claim is not substantial.

As discussed *supra* in Ground Four, during Attorney Davis' closing argument, he argued that the only persons who were responsible for Ledarrious Washington's death were Robert Boyd, Nkosi Chamberlain, and Washington himself (Ex. B at 355–69). Attorney Davis argued Petitioner was "along for the ride; not his plan; not his connection; not his scheme" (*id.* at 356). Davis argued, "Without Mr. Thames, "Ledarrious Washington still dies." (*id.*). Attorney Davis argued:

> You can't remove that cloak of innocence from Mr. Thames unless you are convinced beyond all reasonable doubt that:  Number 1. Ledarrious Washington's death was a consequence of attempted robbery and that he died during the course of that attempted robbery, and I submit to you that he didn't.

(Ex. B at 358).   Davis argued that the physical evidence showed that neither Petitioner nor Ledarrious Washington fired any shots, and that all of the fired shots came from Chamberlain's weapon (*id.* at 359–60).  Attorney Davis further argued that the crime of attempted robbery was abandoned and no longer taking place when

Washington was killed (*id.* at 359–64).  Davis argued that Washington was wounded

but still alive at the time the attempted robbery was abandoned, and Chamberlain

ended Washington's life when he got out of the car and pumped eleven more shots

into Washington's body (*id.*).  Attorney Davis argued that after Chamberlain shot

Petitioner, and Petitioner fled the scene, Chamberlain "sets in motion a new series

of consequences" (*id.* at 364).  Davis argued that Chamberlain made an independent,

premeditated decision to shoot Washington eleven more times (*id.*).  Attorney Davis

continued:

> What was this really a product of?
>
> Was it a product of Ledarrious Washington's scheme to rob Robert Boyd's dope connection, or was it started and was it a consequence of Nkosi Chamberlain's idea and plan to come to our town and sell his poisonous product?
>
> Was it a robbery gone bad, an attempted robbery gone bad or was it a drug deal gone bad?
>
> And that, ladies and gentlemen, is where it all started.  It started in Fort Walton.  But for Nkosi Chamberlain putting the mechanism in motion, okay, none of this would have happened.  There would have been no attempted robbery, but for the attempted drug sell.
> . . . .
> So he's guilty as charged if you believe everything that the State said and you don't consider anything that I have said.  Okay.  The attempted robbery was over.  Okay.  It was done.  My client was nowhere near there when that man was shot, killed and executed by Nkosi Chamberlain.  Abandonment, no abandonment.  He could not

physically be part of that because he wasn't there. He was—Boyd's words long gone.

But now, here is something else that you need to think about and I'm going to sit down. All right. You may say, well, you know what, Davis, I have listened to all of that, man, you are confusing me with of [sic] these consequences and all that, you know, did it start with a drug deal? Did it start with attempted robbery? You know, I don't know, man.

It was like Ledarrious Washington, when he was killed on the ground, okay, kind of feels like he was killed as a part of attempted robbery, if you are thinking that, but if you are thinking it was an attempted robbery by Mr. Thames, you're wrong. If you're thinking he was killed as a part of an attempted robbery, that after Chamberlain got out of the car and executes him, then he goes through the dead or dying man's pocket. Now, there's your attempted robbery. There it is, folks.

Nkosi Chamberlain, why would he get out of the car when the man is already on the ground, dropped his weapon and was no longer a threat? Why? Why? When all he has to do is drive back home. There is no one there to stop him. Why? Because he wants to rob Ledarrious Washington. He finishes him off and he goes through a dead man's pockets. That's the death occurred, if there was a death and he attempted a robbery, Nkosi Chamberlain's attempted robbery of a man he killed that day, Ledarrious Washington.

The only verdict today, ladies and gentlemen, the only proper verdict is not guilty. That's it. For all the reasons that I laid out. That's it. That's the verdict. Think about it.

Hold the government to that exacting standard required for conviction. Don't vote with your gut, with your emotions. Don't confuse common sense and proper analysis, okay, with your emotions and all of that. Somebody has got to pay, and all of that. Your verdict today is not guilty. I have given you things that you can walk back

there in that jury deliberation room, that you can hang your hat on. You can find him not guilty, and I have given you reasons why you should.

It's not something in the Land of Oz. It's not some magical stuff. It's not some smoke screen that I've thrown up. I've given you concrete, specific reasons why the State has not met its burden of proof. He's not guilty, ladies and gentlemen. That's it. He's not guilty.

(Ex. B at 365–69).

Jurists of reason could not disagree that Attorney Davis argued both theories that Petitioner faults him for not arguing: (1) that Washington's death was the result of the independent act of Nkosi Chamberlain, and (2) that the State failed to prove that Washington's death occurred as a consequence of, and while there was an attempt to commit, a robbery in which Petitioner knowingly aided. Petitioner has not stated a substantial IATC claim in Ground Thirteen. Therefore, he is not entitled to further federal review of the claim under *Martinez*.

## V.     CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice

of appeal must still be filed, even if the court issues a certificate of appealability. 28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'" *Miller-El*, 537 U.S. at 336 (quoting § 2253(c)(2)). "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Buck v. Davis*, 580 U.S.—, 137 S. Ct. 759, 773, 197 L. Ed. 2d 1 (2017) (citing *Miller-El*, 537 U.S. at 327). The petitioner here cannot make that showing. Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.    That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

Case No.: 3:18cv1547/MCR/EMT

2.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 23<u>rd</u> day of July 2019.


                         /s/ *Elizabeth M. Timothy*
                         **ELIZABETH M.  TIMOTHY**
                         **CHIEF UNITED STATES MAGISTRATE JUDGE**


## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**